UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
-------------------------------x
                               :
UNITED STATES OF AMERICA,      :
                               :
v.                             :     CASE NO. 3:12CR39(AWT)
                               :
MORRIS CARTER, JR.             :
                               :
-------------------------------x
```

## GEANEY FINDINGS

During the government's case, the court admitted conditionally, pursuant to Fed. R. Evid. Rule 801(d)(2)(E), Government Exhibits 101 through 132, except that with respect to certain of the intercepted communications in each of those exhibits statements by one of the participants were not admitted for the truth of the statement made by that person.

In order for evidence to be admissible under Rule 801(d)(2)(E), the court must find by a preponderance of the evidence "(1) that there was a conspiracy, (2) that its members included the declarant and the party against whom the statement is offered, and (3) that the statement was made both (a) during the course of and (b) in furtherance of the conspiracy." United States v. Diaz, 176 F.3d 52, 83 (2d Cir. 1999) (quoting United States v. Tracy, 12 F.3d 1186, 1196 (2d Cir. 1993)).

For the reasons set forth below, on February 27, 2013, the court informed the parties of its Geaney findings, after concluding that the government had proved by a preponderance of the evidence each element required to be proven in order for

Government Exhibits 101 through 132 to be admissible, except that the following statements were admitted solely for the purpose of putting in context statements made by the other participant or participants in the conversation: in Government Exhibit 101, the statements by Scott Carpenter; in Government Exhibit 104, the statements by "June Bug;" in Government Exhibit 106, the statements by Everton Gunter; in Government Exhibits 112 and 113, the statements by Hassan Muhammad; and in Government Exhibit 118, the statements by Trish (Last Name Unknown).

**Existence of a Conspiracy; Members of the Conspiracy**

While the coconspirator statement itself may be considered in establishing the existence of the conspiracy, "[t]here must be evidence that there was a conspiracy involving the declarant and the nonoffering party..." Bourjaily v. United States, 483 U.S. 171, 175 (1986); see also United States v. Desena, 260 F.3d 150, 158 (2d Cir. 2001) ("[T]here must be some independent corroborating evidence of the defendant's participation in the conspiracy." (internal citations omitted)); United States v. Provenzano, 615 F.2d 37, 44 (2d Cir. 1980) ("The threshold requirement of admissibility is satisfied by a showing of a likelihood of an illicit association between the declarant and the defendant." (internal citations omitted)).  Once a conspiracy is shown to exist, the evidence sufficient to link another defendant to it need not be overwhelming. See Provenzano, 615

F.2d at 45.

The government proved by a preponderance of the evidence that there was a conspiracy. The testimony of Kyshiifa Boyd and Ebony Moore was substantial independent corroborating evidence of the existence of the conspiracy and the identity of a number of the members of the conspiracy.

Boyd testified about her extensive involvement in Joshua Easterling's drug distribution activities. Among other things, she helped Easterling sell crack cocaine, covering for him in his absence. Boyd also testified that she actively participated in packaging crack cocaine. In addition, Moore testified about her own purchases of crack cocaine from Easterling.

Special Agent Ryan James testified about the surveillance conducted at 42-44 Vine Street on December 14, 2011, as a result of which Scott Carpenter was stopped after he left the area. The investigating officers found that the telephone Carpenter had in his possession was the telephone that had been used to place the call to Easterling and they recovered crack cocaine from Carpenter's person.

Each of Boyd and Moore gave testimony that established that the defendant was a member of the conspiracy. Each characterized him as the most significant of Easterling's runners and testified that he also served as a lookout. Boyd testified about her extensive dealings with the defendant during the period of the conspiracy, except for that short period following the incident

where the defendant was chased through the apartment by a Hartford police officer, and she recounted how after a relatively brief period of time the defendant resumed his former pattern of serving as a runner and lookout for Easterling.  She also testified that the defendant and Easterling were not friends and drug dealing was the basis of their relationship.  Moore testified that during the period of time she was purchasing crack cocaine from Easterling she saw the defendant on a daily basis.  She also testified that the defendant was the most significant runner for Easterling, based on her own observations of the defendant and events that occurred around 42-44 Vine Street, and her conversation with Easterling.

Each of Boyd and Moore testified that Juan Cartagena and Chilly Mo, Jr. (Morris Carter III) were Easterling's principal purchasers for resale.  Boyd testified that Easterling's brother, known as "June Bug," was also a significant purchaser for resale.

Thus, the testimony from Boyd and Moore establishes that the defendant, Easterling, Boyd, Moore, Cartagena, Chilly Mo, Jr. (Morris Carter III) and June Bug were all members of the conspiracy.

Two additional declarants appear in the intercepted communications, Larry Love and Paul Lagasse.  With respect to Larry Love, the testimony of Special Agent James established that surveillance units observed Love arrive at and leave 42-44 Vine Street in conjunction with the intercepted calls.  After Love

left 42-44 Vine Street, surveillance units followed him and then conducted an investigatory stop during which crack cocaine was seized from Love's person.  With respect to Paul Lagasse, surveillance units similarly observed him arrive at and leave 42-44 Vine Street in conjunction with the intercepted calls, and a traffic stop of Lagasse's car was initiated after he had left Vine Street.  Crack cocaine was seized from Lagasse and the telephone he had in his possession matched the telephone number from which the calls had been made to Easterling to arrange for the purchase of crack cocaine, and the call had been made to Easterling to report that he had been stopped by the police.

Therefore, the government has established by means of independent corroborating evidence in addition to the intercepted communications themselves that the defendant, Easterling, Boyd, Moore, Cartagena, Chilly Mo, Jr. (Morris Carter III), June Bug, Love and Lagasse were members of the conspiracy.

**During the Course of and in Furtherance of the Conspiracy**

Boyd testified that following Easterling's release from imprisonment in June 2011, he returned to 42-44 Vine Street, and that at the end of July 2011, Easterling began selling drugs again and continued doing so until his arrest on February 23, 2012.  The intercepted communications at issue here all occurred during the period from December 9, 2011 to January 8, 2012.  Thus, all of the statements were made during the course of the conspiracy.

The statements must also be made in furtherance of the conspiracy. "To be in furtherance of the conspiracy, a statement must be more than 'a merely narrative' description by one co-conspirator of the acts of another." United States v. SKW Metals & Alloys, Inc., 195 F.3d 83, 88 (2d Cir. 1999) (citing United States v. Beech-Nut Nutrition Corp., 871 F.2d 1181, 1199 (2d Cir. 1989)) (internal quotation marks omitted). The statement must "prompt the listener . . . to respond in a way that promotes or facilitates the carrying out of a criminal activity." SKW Metals & Alloys, Inc., 195 F.3d at 88 (quoting United States v. Maldonado-Rivera, 922 F.2d 934, 958 (2d Cir. 1990)). Nevertheless, a statement does not need to be a command to be admissible. SKW Metals & Alloys, Inc., 195 F.3d at 88. Rather, the statement may be admissible if it "provide[s] reassurance, or seek[s] to induce a coconspirator's assistance, or serve[s] to foster trust and cohesiveness, or inform[s] each other as to the progress or status of the conspiracy." Id. (quoting Maldonado-Rivera, 922 F.2d at 959).

A good number of the conversations are ones where the declarants are coordinating logistics for meeting to consummate a drug transaction. In some instances, this is obvious from the words that are spoken, although the declarants most frequently speak in coded language. As to communications between Easterling and the defendant, Boyd's testimony established that Easterling was very careful to speak in cryptic language at all times and

-6-

that the defendant and Easterling were not close acquaintances and the basis of their relationship was their drug transactions. The exhibits that fall into this category are Government Exhibits 101, 102, 106, 107, 109, 110, 112, 113, 114, 115, 118, 121, 122, 123, 124, 127, 128 and 129.

Government Exhibits 103 and 104 are conversations where Easterling was giving Boyd instructions for how to handle a drug transaction.

A number of other conversations are ones where the declarants were alerting each other to the presence to law enforcement officers as part of their effort to avoid detection of the conspiracy.  The conversations that fall into this category are those in Government Exhibits 108, 111, 116, 117, 119, 126, 130, 131 and 132.

Two of the conversations are ones where the declarants are simply discussing the progress or status of the conspiracy, namely the conversations in Government Exhibits 105 and 120.

Thus, the court concludes that all of these statements were made for the purpose of furthering the conspiracy.

Signed this 4th day of March, 2013 at Hartford, Connecticut.

                                                    /s/
                                   Alvin W. Thompson
                              United States District Judge